## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ERIC B. MACK, as Personal Representative of the Estate of ANTHONY HARDEN, and ANTONE HARDEN, and      Plaintiffs,<br><br>vs.<br><br>CHELSEA CAMPELLONE, MICHAEL SULLIVAN, THOMAS J. FARIS, Jr., MICHAEL PAVAO, ANASTASIOS PAROUSIS, and CHIEF JEFFREY CARDOZA, all Individually, and CITY OF FALL RIVER, MASSACHUSETTS,      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>COMPLAINT AND REQUEST FOR JURY TRIAL</u>

## <u>INTRODUCTION</u>

On November 22, 2021, Fall River Police Department ("FRPD") officers Chelsea Campellone ("Campellone") and Michael Sullivan ("Sullivan"), both of whom were inexperienced police officers, received information concerning an alleged domestic dispute involving decedent Anthony Harden[1] ("Anthony"). The alleged domestic dispute occurred two days before Defendants Campellone and Sullivan made a warrantless entry into Anthony's apartment in the City of Fall River (the "City"), Anthony being an unarmed black man. Within three minutes, Campellone, using excessive deadly force, and without using any lesser means of force or even speaking with Anthony, shot and killed Anthony in his own bedroom. In the immediate aftermath of the shooting, Campellone, who was immediately removed from the scene to avoid the public seeing who shot and killed Anthony, asked Sergeant James Machado ("Sgt. Machado"), "Am I

---

[1] As several persons with the surname "Harden" are referred to in this complaint, each individual with the surname "Harden" is referred to by his or her first name.

going to be fired?"  To avoid holding the officers accountable for their misconduct, various FRPD officers engaged in a coverup to protect Campellone and Sullivan by, among other things, claiming falsely that Anthony had a knife and attempted to stab Sullivan.  In the aftermath of the shooting, police officers removed Antone Harden ("Antone"), Anthony's twin brother who engaged in no wrongdoing, from his bedroom at gunpoint.  Officers then, without a warrant or probable cause, transported Antone to the police station in handcuffs.  Officers interrogated Antone, pressuring him to give them information that police could try to use to support the false narrative that Anthony attacked Sullivan with a knife.

The Complaint asserts civil rights and other claims against Campellone, Sullivan, several other police officers and the City arising out of the unlawful fatal shooting of Anthony, and the City's police officers and department's attempted coverup of the true facts of Anthony's killing, and seeks damages, attorneys' fees, and punitive damages.  Antone asserts claims arising out of the harrowing ordeal he experienced during and after the shooting.  The Complaint also seeks permanent injunctive relief against the City which, in essence, addresses an embedded, historic culture of police coverups, racist attitudes, fabrication of evidence and the use of excessive force.

## JURISDICTION

1.      Counts V through VI, X through XII, and XV through XVIII of the Complaint set forth civil actions brought to redress deprivations, under color of state law, of rights secured by the Constitution of the United States and by an Act of Congress, pursuant to 42 U.S.C. §1983. This Court has jurisdiction, pursuant to 28 U.S.C. §1343, and 28 U.S.C. §1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States.

2.      Counts I through IV, VII through IX, and XIII, XIV and XIX of the Complaint aver causes of action which are related to the causes of action set forth in Counts V through VI, X through XII, and XV through XVIII and arise out of the subject matter of those counts. This Court has jurisdiction over those Counts by virtue of the doctrine of pendent jurisdiction and 28 U.S.C. §1367(a).

### PARTIES

3.      Plaintiff Eric B. Mack ("Mack") is an individual who resides in the City.  He is Anthony's brother, a now deceased adult black African-American male.

4.      Mack was duly appointed Personal Representative of the Estate of Anthony Harden (the "Estate") by Order of the Massachusetts Probate and Family Court, Bristol County, in the matter of *Estate of Anthony Harden*, Docket No. BR22P-1393EA, on November 4, 2022.  Mack brings this action as Personal Representative of the Estate and all persons entitled to receive any damages recovered.

5.      Plaintiff Antone Harden ("Antone") is an individual and resides in the City.  Antone is black, and he is Anthony's twin brother.

6.      Defendant Chelsea Campellone ("Campellone"), who, upon information and belief, is white, was, at all times relevant to the Complaint, a duly appointed police officer of the City. Her actions alleged in the Complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City.  She is sued in her individual capacity and she resides in the City.

7.      Defendant Michael Sullivan ("Sullivan"), who, upon information and belief, is white, was, at all times relevant to the Complaint, a duly appointed police officer of the City.  His actions alleged in the Complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City.  He is sued in his individual capacity and he resides in the City.

8.     Defendant Michael Pavao ("Pavao") was, at all times relevant to the Complaint, a duly appointed police officer of the City. His actions alleged in the Complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City. He is sued in his individual capacity and, upon information and belief, he resides in the State of Maine.

9.     Defendant Antanasios Parousis ("Parousis") was, at all times relevant to this complaint, a duly appointed police officer of the City. His actions alleged in the Complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City. He is sued in his individual capacity and he resides at a place presently unknown to Plaintiffs.

10.     Defendant Thomas J. Faris, Jr. ("Faris") was, at all times relevant to the Complaint, a duly appointed police officer of the City. His actions alleged in the Complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City. He is sued in his individual capacity and he resides at a place presently unknown to Plaintiffs.

11.     Defendant City of Fall River (the "City") is a municipality established under the General Laws of Massachusetts with its City Hall located at 1 Government Center, Fall River, Massachusetts. At all times relevant, the City operated and controlled the FRPD, and, further, promulgated and otherwise adopted under color of law certain rules, practices, procedures and policies for use by its law enforcement officers as well as certain ordinances, by-laws, custom and usages which deprived decedent Anthony and Antone of their respective rights and privileges under the Constitution and laws of the United States.

12.     The City operates and oversees the FRPD.

13.    Defendant Chief Jeffrey Cardoza ("Cardoza") was, at all times relevant to the Complaint, the City's Chief of Police.  His actions alleged in the Complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City.  At all times relevant, Cardoza set, and implemented the use of, the policies, practices, procedures and customs for the FRPD, and for the officers under his command.  He is sued in his individual capacity and as supervisor of the police officers named as defendants in the Complaint.

**FACTS**

**A.    As of November 22, 2021, Defendant Campellone Was Unfit to Serve as a Police Officer, and, in Particular, to Handle Domestic Violence Calls.**

14.    Between July 28, 2020 and October 15, 2021, a period of approximately fourteen and one-half months, Defendant Campellone, while on duty, was involved in four separate police cruiser collisions.

15.    Defendant Campellone was disciplined or suspended as a result of her conduct relating to some of the cruiser collisions.

16.    On February 15, 2021, a cruiser operated by Defendant Campellone struck a telephone pole, causing her to strike her head on the windshield, and, she believes, to lose consciousness.  She was hospitalized.

17.    On October 15, 2021, just five weeks before the shooting, Defendant Campellone while operating her cruiser suffered a second head injury in a collision. She was hospitalized.

18.    On November 8, 2021, just two weeks before the shooting which is the subject of the Complaint, Defendant Campellone sought an Abuse Prevention Order pursuant to Mass. Gen.

Laws c. 209A against her ex-boyfriend, Jordan Cavaco ("Cavaco"), a then Massachusetts State Police ("MSP") trooper.

19.     Defendant Campellone claimed she had been struck and thrown by Cavaco, and that his domestic abuse caused her substantial emotional distress and harm.

20.     FRPD Captain Barden H. Castro ("Castro") witnessed and signed the Abuse Prevention Order.

21.     On November 8 and 10, 2021, the MSP interviewed Defendant Campellone about Cavaco.

22.     During her first interview, Defendant Campellone discussed a violent episode with Cavaco that occurred in May, 2021 – an incident which she did not report to police until she sought her 209A abuse prevention order in November, 2021.

23.     Defendant Campellone ended the relationship with Cavaco because she did not want to be a "cop caller."

24.     Defendant Campellone told MSP she was talking to herself while she was crying, saying to herself, "you go on calls for this sh*t, what's wrong with you?"

25.     When Defendant Campellone did not wish to reveal certain facts to MSP, the investigators told her she could reveal whatever she felt comfortable revealing to them.

26.     During her first interview, Defendant Campellone claimed Cavaco had struck and pushed her, and acknowledged her striking Cavaco in the face with a fiberglass cast that she was wearing as a result of a work-related motor vehicle collision in February, 2021.

27.     Cavaco suffered serious injuries when he was struck with Defendant Campellone's fiberglass cast.

28.     Defendant Campellone was never charged with assault or assault and battery or assault and battery by means of a dangerous weapon.

29.     Rather, despite photographs verifying Cavaco's injuries, the Commonwealth determined that, if a criminal complaint were issued against Defendant Campellone in Cavaco's private complaint application, the Commonwealth would not prosecute Defendant Campellone and would file, before her arraignment, a *nolle prosequi* in the matter.

30.     Despite Defendant Campellone's established history of domestic violence as both victim and perpetrator, and her claimed emotional distress of which the FRPD was aware, the FRPD permitted Defendant Campellone to continue to serve in a full time capacity as a police officer, without restrictions and, as a police officer, to respond to domestic violence calls.

31.     Upon information and belief, before the shooting of Anthony on November 22, 2021, Defendant Campellone never sought leave from her employment due to her emotional distress.

32.     The FRPD has a Personnel Early Warning System Policy that outlines the procedures to be used to identify potential personnel problems in their initial stages in order to redirect an employee's actions/behaviors in a fashion consistent with the FRPD's values and standards.

33.     The Early Warning System Policy requires that supervisors report all aspects of a subordinate's conduct that is problematic and/or initiate a Personnel Early Intervention System review based on a single significant event or based on an on-going pattern of identified behaviors.

34.     Plaintiffs are unaware of any instance in which the FRPD initiated a Personnel Early Intervention System review regarding Defendant Campellone, despite evidence indicating that such a review was necessary.

35.     Upon information and belief, at no time prior to the shooting death of Anthony, did the FRPD require Defendant Campellone to participate in therapy, counselling or a fitness-for-duty evaluation arising out of her domestic violence or emotional distress issues.

**B.      Defendant Campellone kills Anthony in his bedroom while on a domestic violence-related call.**

36.     As of November 22, 2021, Anthony, who had celebrated his 30th birthday less than two months earlier, was residing with his twin brother, Antone, at an apartment located at 120 Melville Street, Fall River, Massachusetts (the "Apartment").

37.     The Apartment had two bedrooms, one for each brother, a bathroom and a kitchen. The kitchen was non-functioning, as it had been undergoing renovations. As a result, Anthony and Antone each kept plates and silverware, including, without limitation, knives, in their respective bedrooms, and they washed their dishes in the shared bathroom.

38.     As of November 22, 2021, Anthony was married to Chelsea Harden ("Chelsea"), the mother of their minor child, F. J. H., then two years of age. As of November 22, 2021, Anthony had a close, loving relationship with F. J. H.

39.     As of November 22, 2021, Anthony was separated from, but still married to, Chelsea and the relationship between Anthony and Chelsea had greatly improved after an alleged domestic incident of 2019.

40.     Chelsea would bring F.J.H. with her to visit Anthony at the Apartment to allow Anthony to spend time with his daughter.

41.     Anthony would at various times also provide financial support to both Chelsea Harden and F.J.H.

42.     As of November 22, 2021, one Sarah Grealish ("Grealish") was Anthony's intermittent girlfriend.

43.     On November 22, 2021 at 4:00 p.m., Defendant Sullivan began his regular evening shift as a uniformed patrol officer at the FRPD.

44.     At the time, he traveled in his own cruiser, without a partner, and he carried his department issued Smith and Wesson M&P .40 caliber firearm with a 15 round magazine which was fully loaded and two additional 15 round magazines which were also fully loaded.  He also had other department-issued use-of-force equipment, including, without limitation, oleoresin capsicum ("OC") spray, a taser and a baton.

45.     As of November 22, 2021, Defendant Sullivan had worked as a uniformed patrol officer for the FRPD for approximately eleven months.

46.     On November 22, 2021 at 4:00 p.m., Defendant Campellone began her regular evening shift as a uniformed patrol officer at the FRPD.

47. At the time, she traveled in her own cruiser, without a partner, and she carried her department-issued Smith and Wesson M&P .40 caliber firearm with three loaded magazines of ammunition, and other department-issued use of force equipment, including without limitation, OC spray and a baton.

48. As of November 22, 2021, Defendant Campellone had worked as a uniformed patrol officer for the FRPD for approximately two years, although she had missed many months of work over that two year span due to injuries she sustained in cruiser collisions from July, 2020 to October, 2021.

49. On November 22, 2021, the FRPD failed to issue a taser to Defendant Campellone, who had been trained in the use of tasers, because the FRPD lacked a sufficient number of taser holders for each of the tasers it possessed.

50. On November 22, 2021 at approximately 5:13 p.m., Grealish contacted the FRPD and made allegations of domestic abuse and theft against Anthony arising out of an alleged two-day-old altercation which allegedly occurred on November 20, 2021.

51. On November 22, 2021 at approximately 5:18 p.m., Defendants Campellone and Sullivan responded to Grealish's apartment to investigate her domestic violence allegations.

52. After speaking with Grealish, Defendants Campellone and Sullivan, believing her allegations travelled separately to the Apartment for the apparent purpose of arresting Anthony.

53. There was no emergency that compelled the immediate arrest of Anthony to protect Grealish, and there was no reason for Defendants Campellone and Sullivan to believe that Grealish was in imminent danger of being abused by Anthony.

54.     The arrest of Anthony was not a reasonable means to prevent any further abuse. *See* Mass. Gen. Laws c. 209A §6.

55.     At no time before Defendants Campellone and Sullivan entered the Apartment did Defendants Campellone or Sullivan, or any other officer, agent, servant or employee of the FRPD, seek and/or obtain an arrest warrant pertaining to Anthony arising out of the incident reported by Grealish to Defendants Campellone and Sullivan on November 22, 2021.

56.     At approximately 6:14:35 p.m. on November 22, 2021, Defendants Campellone and Sullivan arrived at the Apartment.

57.     Shortly before Defendants Campellone and Sullivan arrived at the Apartment, Anthony and Antone, both of whom were at the Apartment at the time, discussed ordering a pizza for dinner.

58.     At the time that the officers arrived, Anthony, who was unarmed, was sitting in a chair in his cramped bedroom at the Apartment, charging his court-ordered ankle bracelet.

59.     In response to a knock on the door of 120 Melville Street, Fall River, Massachusetts, the landlord, who resided in a separate apartment on the second floor, opened the locked exterior door for Defendants Campellone and Sullivan, thereby affording the officers access to a common area outside of the Apartment.

60.     Thereafter, the landlord opened the door to the Apartment for Defendants Campellone and Sullivan.

61.     Defendants Campellone and Sullivan immediately, upon entry, encountered Antone and his dog at the Apartment, and, at the request of Defendants Campellone and Sullivan,

Antone and his dog went to Antone's bedroom, which was directly across the hallway from Anthony's bedroom.

62.     Defendants Campellone and Sullivan then entered the Apartment and proceeded to Anthony's bedroom, which had no door.

63.     While Defendant Sullivan and Defendant Campellone stood outside of Anthony's bedroom, Defendant Sullivan knocked on the doorframe of Anthony's bedroom.

64.     Defendant Sullivan asked Anthony to exit the bedroom to speak with them, but Anthony declined, stating that he was charging his ankle bracelet.

65.     At no time was Anthony obligated to exit his bedroom.

66.     At or around that point, without first obtaining consent or a warrant, Defendants Sullivan and Campellone wrongfully entered Anthony's bedroom.

67.     Anthony instructed Defendants Campellone and Sullivan to exit his bedroom.

68.     Defendants Campellone and Sullivan did not leave the bedroom in response to Anthony's demand.

69.     At that time, Defendants Sullivan and Campellone each stood less than five feet away from Anthony.

70.     At or around that time, Defendant Sullivan asked, in words or substance, "Are you Anthony Harden?" and "Can you stand?"

71.     Anthony responded that he was charging his ankle monitor.

72.     Approximately five seconds after Anthony stated he was charging his ankle monitor, Antone, from his bedroom, heard scuffling in Anthony's bedroom.

73.     Defendant Campellone later alleged to investigators falsely that Anthony jumped up and grabbed a shiny metallic object which she thought to be a knife with his right hand from a small table and charged at Defendant Sullivan.

74.     Defendant Campellone admits she never saw Anthony with a knife either before or after she shot Anthony; instead, she falsely claimed he possessed a knife only during the few seconds he was engaged with Defendant Sullivan.

75.     When asked directly by MSP if he ever saw Anthony with a knife in his hand or near his person, Defendant Sullivan responded, "no sir."

76.     Defendant Sullivan later alleged to investigators falsely that he saw an object in Anthony's hands, but Defendant Sullivan did not identify that object to investigators to be a knife.

77.     Upon information and belief, at no time did Anthony have any knife, object or other weapon in either hand during his alleged encounter with Defendants Campellone and Sullivan.

78.     At no time did Defendant Sullivan or Defendant Campellone suffer any knife wounds, slash wounds, lacerations or other wounds during the encounter that were reflective of an altercation involving a knife.

79.     At no time did Defendant Sullivan take any steps to prevent Defendant Campellone from using excessive force on Anthony.

80.     During the physical scuffle between Anthony and Defendant Sullivan, during which scuffle Defendant Sullivan used excessive force on Anthony, Antone heard Defendant Sullivan tell Anthony to stop resisting, an order which demonstrates that Anthony was, at most,

attempting to get away from the officers, and not that Anthony was attacking Defendant Sullivan with any object.

81.     At no time did Defendant Sullivan wield or use any of his use-of-force equipment, including, without limitation, his service weapon or his taser during the encounter.

82.     Upon information and belief, neither Defendant Campellone nor Defendant Sullivan told any investigator, and/or wrote in any report, that Defendant Sullivan told Anthony to stop resisting.

83.     Approximately five seconds after Antone first heard a scuffle from Anthony's room, and less than two minutes after Defendants Campellone and Sullivan entered the Apartment, Defendant Campellone, who had not spoken to Anthony up to that point, fired the first of at least two shots from her service weapon which struck Anthony.

84.     Defendant Campellone's close-range shot did not strike Defendant Sullivan, even though Defendant Sullivan initially thought he had been shot.

85.     Upon information and belief, Defendant Campellone was positioned to Defendant Sullivan's right and less than six feet from Anthony when she fired her weapon.

86.     Defendant Campellone's shot was reckless given her proximity both to Defendant Sullivan and to Anthony.

87.     At the time Defendant Campellone first fired her service weapon, she did not have a reasonable belief either that Anthony was likely to cause death or serious bodily harm to Defendant Sullivan or to herself and/or that her life, and/or the life of Defendant Sullivan, was in imminent danger or jeopardy from Anthony.

88.     After Defendant Campellone first shot and injured Anthony, and Anthony posed no danger to either Defendant Campellone or to Defendant Sullivan, Anthony allegedly turned and looked at Defendant Campellone.

89.     Defendant Campellone then fired a second close range shot which struck Anthony.

90.     At the time Defendant Campellone fired a second shot from her service weapon, she did not have any reasonable belief either that Anthony was likely to cause death or serious bodily harm to Defendant Sullivan or to herself and/or that her life, and/or the life of Defendant Sullivan, was in imminent danger or jeopardy from Anthony.

91.     One of the two gunshots penetrated Anthony's left mid outer chest, and then traveled to the right and downwards to the right outer abdomen, without significant front to back deviations.  The other gunshot penetrated Anthony's left upper outer chest, and then travelled to the right and downward to the right outer abdomen, with a back to front trajectory.

92.     Anthony fell to the floor - alive, but gravely wounded.

93.     At no time during the incident did Defendants Sullivan or Campellone attempt to employ any de-escalation tactics or lesser means of force on either of the two occasions before Defendant Campellone employed deadly force against Anthony.

94.     Under the circumstances, no basis existed for Defendant Campellone to use deadly force against Anthony.

95.     To the extent any force was necessary, which Plaintiffs deny, Defendants Campellone and Sullivan, had time to, and should have, used either lesser means than deadly force and/or de-escalation measures, but they failed to do so.

96.     On November 22, 2021 at 6:17:08 p.m., Defendant Sullivan made a radio call for an officer in need of assistance and for shots fired.

97.     On November 22, 2021 at approximately 6:17:20 p.m., FRPD dispatch made a radio transmission over all FRPD channels concerning the shots fired call, and provided the address of the Apartment.

98.     Defendant Campellone, in fear for her safety and panicking, immediately went and locked herself inside the Apartment.

99.     In response to Defendant Sullivan's call, many FRPD officers descended on the apartment, clogging up Melville Street, and impeding emergency medical services, with their cruisers remaining in the street.

100.    Anthony, who was suffering in extreme pain and lying on the floor of his bedroom, crawled on the floor, said that he was unable to breathe, and made grunting noises.

101.    Defendant Parousis, who was the first of many officers to arrive on the scene and who was ultimately the Sergeant in charge of the scene, placed Anthony, who, at the time, continued to struggle to breathe and posed no threat to anyone, in handcuffs, causing Anthony to suffer increased agony.

102.    Defendant Parousis did not observe any knife on or around Anthony, or in his possession, at any time.

103.    Defendant Parousis and Officer Rory McCoomb, ("McCoomb") who had also arrived on scene, upon hearing Anthony complain that he was having trouble breathing, helped Anthony to sit up.

104.     As Defendant Parousis assisted Anthony to sit up, he observed no knife either on Anthony's person or in his possession or anywhere in his immediate vicinity, either on the floor, or near his hands or his body.

105.     Immediately after the shooting, no one observed any knife on Anthony's person or in his possession or anywhere in his immediate vicinity, either on the floor, or near his hands or his body.

**C.     Shortly after the shooting, FRPD officers removed Defendants Sullivan and Campellone from the Apartment.**

106.     On November 22, 2021, at 6:20 p.m., Fall River Emergency Medical Services arrived at 120 Melville Street, Fall River, Massachusetts.

107.     The emergency medical personnel was required to wait approximately five minutes for the scene to be "cleared" by police officers before they were permitted access to Anthony in the Apartment.

108.     The emergency medical personnel found Anthony conscious, lying supine on the floor, and with palpable carotid pulses.  Anthony complained of shortness of breath.

109.     The emergency medical personnel, with the assistance of Defendant Pavao, removed Anthony from his bedroom on a backboard and brought him to an ambulance.

110.     After Defendant Pavao assisted in bringing Anthony to the ambulance on the backboard, Defendant Parousis ordered McCoomb to secure the scene of the shooting.

111.     At no time did either of the emergency personnel at the Apartment see any knife on or near Anthony's person or in his possession or anywhere in his immediate vicinity, either on the floor, or near his hands or his body.

112.     At approximately 6:29 p.m., Anthony was transported to a hospital for emergency treatment – the departure of the ambulance from the scene having been delayed for several minutes because the exit path was obstructed by several FRPD cruisers parked on Melville Street.

113.     While the emergency personnel initially planned to transport Anthony to Rhode Island Hospital in Providence, Rhode Island, because Anthony's condition deteriorated so quickly enroute and he lost consciousness, the ambulance was diverted to Saint Anne's Hospital in Fall River, MA.

114.     When Defendant Campellone left the Apartment, she asked Defendant Sullivan if he was okay because she believed she had shot him.

115.     Sgt. Machado, who arrived on the scene, had an officer take Defendant Campellone from the scene to remove her from public eye to make it less demanding for her.

116.     While waiting for her medical transport, Defendant Campellone asked Machado, "Am I going to be fired?"

117.     When getting in the ambulance with Defendant Campellone, Sgt. Machado obtained Defendant Campellone's duty belt, which included, without limitation, her service weapon.

118.     On November 22, 2021, at 6:51 p.m., at Saint Anne's Hospital, Dr. Michael Forzano pronounced Anthony deceased.

119.     McCoomb remained at the Apartment, for purposes of both securing the Apartment and controlling who entered the Apartment, until approximately 1:00 a.m. on November 23, 2021.

120.     Despite the presence of McCoomb and others at the scene to keep Anthony's and Antone's home secure pending the receipt of a search warrant, several FRPD officers and MSP personnel entered and left the home, without a warrant.

121.     Upon information and belief, none of the reports pertaining to the shooting recited any conduct, events, or occurrences at the Apartment during these post-shooting warrantless entries into the Apartment.

122.     Within hours of the shooting, Bristol County District Attorney Thomas Quinn stated in a press conference, vaguely, without specifying its exact location, that a knife was "present" at the scene, but he did not state either that a knife was used to attack anyone or that Anthony had attempted to stab anyone with a knife.

**D**.     **Officers Wrongfully Seize Antone**

123.     Antone heard the entire harrowing incident from his bedroom.

124.     Antone, worried about the wellbeing of his twin Anthony after hearing the gunshots, was too terrified to leave his bedroom, and he listened in fear as officers shouted and moved quickly around his apartment and upstairs.

125.     A terrified Antone, fearful that he, too, would be shot, yelled to officers in order to alert them that he was in his bedroom.

126.     The officers proceeded to check other rooms before approaching Antone's bedroom.

127.     At some point before Anthony was removed from the Apartment, several officers, including, without limitation, Defendants Pavao and Faris, focused upon Antone's bedroom.

128.     Officers asked Antone whether anyone else was present at the Apartment.

129.     Antone responded that he, alone, was present at the Apartment.

130.     Antone, who had his dog with him in his bedroom, opened the door slowly and, while restraining the dog, and so as not to be shot, exited his bedroom with his hands up.

131.     Defendants Faris and Pavao, with their service weapons pointed at Antone, ordered Antone, who was unarmed and exhibited no indication of being a safety risk to himself or to any police officer, and who showed no indication that he would interfere with the crime scene in the Apartment, to show his hands.

132.     Upon information and belief, other officers also present had their weapons pointed at Antone.

133.     Defendants Faris and Pavao then ordered the cooperative Antone, at gunpoint, to exit his bedroom.

134.     Defendants Faris and Pavao then handcuffed and conducted a pat frisk of the unarmed Antone.

135.     Despite having engaged in no wrongdoing whatsoever, Antone, in handcuffs, was then led, in custody, outside to a FRPD cruiser.

136.     An unknown FRPD officer then ordered Antone to sit in the rear of the police cruiser, and Antone complied.

137.     Antone had never been in handcuffs before in his life, and he posed no threat to anyone.

138.     Antone was transported to the police station, still in handcuffs, where he was interrogated by FRPD officers for approximately one hour by an officer seeking to obtain negative information about Anthony and seeking to have Antone place, position or locate a weapon (and, in particular, a knife) near Anthony.

139.     After approximately an hour, Antone heard his sister, Carola Harden, screaming in grief from the adjoining room, where she and other family members, who had also been interrogated by officers seeking negative information about Anthony, were told Anthony had died.

140.     At or around that point, Antone's interrogation ended, and an officer told Antone, who was still in handcuffs, that his twin brother Anthony had died.

**E.     The Coverup of the Shooting by FRPD Officers**

141.     The violation of police protocol by presenting false information and concealing information to obscure true facts as a part of a coverup to protect Defendants Campellone and Sullivan from prosecution and civil liability began immediately after the shooting.

142.     Upon information and belief, an excessive number of police officers entered the crime scene in the wake of the shooting and moved and disturbed evidence without following proper crime scene protocols.

143.     At approximately 6:30 p.m. on November 22, 2021, the FRPD started to compile a crime scene log, which was supposed to track officers entering and leaving the Apartment.

144.     Throughout the evening, various police officers entered and left the Apartment before the FRPD obtained a warrant to search the Apartment, and their entries and departures thereby compromised the scene.

145.    The Crime Scene Log-in Log, which lists only one time per person, and not both an entry and departure time, did not include the names of some people who entered the Apartment that evening, including, without limitation, Defendant Pavao.

146.    Following the shooting, Defendant Campellone was transported by ambulance to Charlton Memorial Hospital ("Charlton") for evaluation.

147.    Sgt. Kevin B'Shara ("B'Shara") of the FRPD ordered Defendant Pavao to drive Defendant Sullivan to Charlton.

148.    When B'Shara asked Defendant Sullivan if he had been injured, Defendant Sullivan responded that he had not been injured.

149.    At no time before driving Defendant Sullivan to Charlton did Defendant Pavao tell anyone that Defendant Pavao had allegedly seen or moved a knife in Anthony's bedroom.

150.    At or around this time, Defendant Sullivan texted his brother-in-law, Officer Erick Bettencourt ("Bettencourt") and told Bettencourt to meet him at Charlton. At the request of B'Shara, Defendant Pavao drove Defendant Sullivan to Charlton.

151.    According to Defendant Pavao, Defendant Sullivan and Defendant Pavao spoke on the way to Charlton.

152.    According to Defendant Pavao, Defendant Sullivan told Defendant Pavao to contact Bettencourt and have him meet them at Charlton.

153.    While at Charlton, upon information and belief, Defendants Sullivan, Campellone, Pavao and Bettencourt all spoke with one another.

154.    When Defendant Pavao allegedly called B'Shara, Defendant Pavao revealed, for the first time, that, after Antone was extracted from Antone's bedroom Defendant Pavao had

entered Anthony's bedroom, located a knife on the floor of the bedroom, moved the knife and placed it behind a television.

155.     Upon information and belief, B'Shara allegedly instructed Defendant Pavao to call Defendant Parousis to inform Defendant Parousis of same, with which instruction Defendant Pavao allegedly complied.

156.     At Charlton, Defendants Campellone and Sullivan were placed in recliners in the same treatment room, with only a curtain separating them.

157.     While Defendants Campellone and Sullivan were being evaluated at Charlton, Sgt. Machado took custody of Defendant Sullivan's service weapon.

158.     Upon information and belief, at no time was Defendant Sullivan's service weapon ever tested.

159.     On either late in the evening on November 22 or early in the morning of November 23, 2021, Defendant Sullivan's service weapon was returned to him at his house.

160.     In addition to interviewing Antone in the immediate aftermath of the shooting, the FRPD also brought Grealish to the FRPD for questioning at approximately 8:16 p.m. on November 22, 2021.

161.     During the questioning, the FRPD asked Grealish for the location of weapons, including, without limitation, knives, within the Apartment in an effort to portray Anthony as the aggressor in Defendant Campellone's shooting of Anthony.

162.     Grealish told investigators, among other things, that Anthony kept knives and dishes behind the television in his bedroom.

163.     During the interview of Anthony's siblings, FPRD, without telling the family members that Anthony had died until the end of their interview, asked for the location of any

weapons, including, without limitation, knives, in the Apartment in an effort to portray Anthony as the aggressor in Defendant Campellone's shooting of Anthony.

164.    While other FRPD officers prepared narrative reports after the shooting on November 22, 2021, and November 23, 2021, upon information and belief, Defendants Campellone and Sullivan did not prepare any narrative report relating to the shooting on either of those days.

165.    In a report prepared by McCoomb on either November 22, 2021 or the morning of November 23, 2021, McCoomb did not mention either allegedly observing any knife, or that he had told Defendant Parousis he had found a knife.

166.    In a report prepared by Defendant Pavao either on November 22, 2021 or the morning of November 23, 2021, Defendant Pavao, upon information and belief, falsely claimed he observed a knife with a black handle and a stainless steel blade on the floor of the bedroom when he was clearing items in order to move Anthony on a backboard.  Upon information and belief, he falsely claimed that, for safety purposes, he moved the knife and placed it on a desk in the bedroom.

167.    In a report prepared by Defendant Parousis on either November 22, 2021 or the morning of November 23, 2021, Defendant Parousis claimed he observed a stainless steel knife with a black handle on top of a table.

168.    Defendant Pavao called Defendant Parousis and, upon information and belief, in the telephone call, Defendant Pavao falsely claimed Defendant Pavao had found the knife on the floor near where Anthony was on the floor.

169.     Late in the evening of November 22, 2021, MSP Trooper Christopher M. Johnson ("Johnson"), who was assigned to the Bristol County District Attorney's Office, MSP Detective Unit, prepared a search warrant affidavit for the purpose of searching the Apartment.

170.     In a single-spaced, five page affidavit, Johnson, after allegedly obtaining information from various FRPD officers, wrote, in a paragraph that was chronologically out of order in comparison to the remainder of his affidavit, "When the decedent was rolled, they observed a knife that had been underneath the decedent."  Upon information and belief, that sentence is untrue.

171.     Moreover, the affidavit vaguely described the knife as "[a] bladed weapon of unknown size and description," which contradicts the false narrative developed by Defendant Pavao and others concerning a knife specifically described as a "steak knife with a black handle." The search warrant affidavit also, upon information and belief, erroneously and untruthfully states that Anthony "lunged" with a knife at Defendants Campellone and Sullivan.

172.     Upon information and belief, the search warrant was issued in the early morning hours of November 23, 2021.

173.     On November 23, 2021, at approximately 1:15 a.m., members of the MSP Detective Unit assigned to the Bristol County District Attorney's Office, the MSP Crime Scene Services Section, and the MSP Firearms Identification Section, accompanied by various members of the FRPD, executed a search warrant at the Apartment.

174.     During the search of the apartment, MSP Trooper Beth Garfield prepared a sketch detailing the locations of evidence at the scene.

175. The MSP sketch, made only hours after the shooting, when compared with photos taken at the scene that night, demonstrates that the alleged knife was situated next to a cellphone and under the bed, and away from where Anthony was located after being shot.

176. At no time have the MSP, the Bristol County District Attorney's Office or the FRPD acknowledged that officers contaminated and compromised the crime scene, in violation of crime scene protocols.

177. According to the Search Warrant return, the investigators seized three knives:

    a.    "Steak knife discovered behind television in northeast bedroom of 120 Melville Street,"

    b.    "black steak knife blade discovered at the foot of bed of northeast bedroom of 120 Melville Street," and

    c.    "steak knife discovered on floor of northeast bedroom of 120 Melville Street."

178. Upon information and belief, no witnesses to the shooting and/or its immediate aftermath reported observing three knives in Anthony's bedroom.

179. In violation of FRPD practices, policies and procedures, Defendant Pavao took no precautions to preserve the knife (and/or the location of the knife) for evidentiary purposes by, among other things, taking photographs of the knife where he allegedly found it, and marking the location of the knife.

180. If Defendant Pavao did pick up a knife and place it on the table, he contaminated crucial evidence by failing to mark the location of the knife at the time of picking it up.

181. At no time did Defendant Parousis, or any other officer, agent, servant or employee of the FRPD criticize and/or reprimand Defendant Pavao or any other FRPD Officer for spoiling or contaminating important evidence or for contaminating the crime scene.

182. None of the several emergency services personnel and police officers present at the Apartment stated that they observed Defendant Pavao pick up any knife.

183. As a part of its investigation, the MSP Detectives Unit conducted videotaped interviews of several of the officers and medical personnel involved in the shooting.

184. On November 26, 2021, Defendant Sullivan, with counsel, participated in a videorecorded interview with investigating officers, Sgt. Jeremiah Donovan and Lt. Bob Plant of the MSP Detectives Unit.

185. On December 6, 2021, Defendant Pavao claimed in a videorecorded interview with Sgt. Donovan and Lt. Plant of the MSP that, while he was clearing a pathway for responders to get into Anthony's bedroom (as opposed to the contention in the search warrant application that the knife was discovered while Anthony was being placed on a backboard), Defendant Pavao observed a black-handled steak knife on the floor. According to Defendant Pavao, the knife was approximately two feet from Anthony's feet, and Defendant Pavao picked up the knife for safety reasons.

186. On December 8, 2021, McCoomb, with counsel, participated in an approximately twenty-minute video recorded interview with Sgt. Jeremiah Donovan and Lt. Bob Plant of the MSP Detectives Unit. During that initial interview (and in his supplemental report), McCoomb did not mention either his observing any knife, or that he had told Defendant Parousis that he had found a knife.

187.     Fifteen minutes after the videotaped interview ended, his second interview began, and, at that time, McCoomb, for the first time, claimed that, when he returned to Anthony's bedroom after bringing Anthony to the ambulance to secure the scene, he observed a black handled steak knife just below a computer table, and that he believes he told Defendant Parousis about the knife.

188.     After McCoomb was left assigned to secure the Apartment, he claims he stood in Anthony's doorway and made a scan of the room and he saw a knife behind Anthony's television.

189.     Upon information and belief, it was virtually impossible for McCoomb to have seen a knife behind Anthony's television from the doorway of Anthony's bedroom.

190.     Upon information and belief, McCoomb made a warrantless search of Anthony's bedroom after the shooting took place.

191.     On December 7, 2021, only 15 days after the shooting, FRPD Chief Cardoza began a leave of absence from his position of Chief of Police, and he retired from the police department in March, 2022.

192.     On December 22, 2021, approximately one month after the shooting and before the MSP completed its investigation, D.A. Quinn issued an initial report entitled "District Attorney's Finding and Conclusion Regarding the Fatal Officer-Involved Shooting of Anthony Harden which Occurred in Fall River on November 22, 2021."

193.     While the report claims the MSP performed the investigation, officers from the FRPD participated in various interviews and assisted the MSP in obtaining evidence, such as surveillance videos.

194.    On February 2, 2022, Defendant Sullivan completed a Use-of-Force Report pertaining to the shooting of Anthony which, upon information and belief, did not provide any narrative concerning the shooting.

195.    Upon information and belief, D.A. Quinn's son, Brian Quinn, has been a good friend of Defendant Sullivan since they were young children.

196.    Upon information and belief, Defendant Sullivan and Brian Quinn attended, and were roommates at, Framingham State University.

197.    Upon information and belief, at all relevant times, Defendant Sullivan's sister, Kate Sullivan, was employed by D.A. Quinn.

198.    Upon information and belief, D.A. Quinn provided financial assistance to Defendant Sullivan when Defendant Sullivan was a youth.

199.    Despite these obvious conflicts and biases, and clear appearances of improprieties, D.A. Quinn never disclosed the conflict of interest, recused himself, or his office, from the investigation of Anthony's death.

200.    In the Initial Report, D.A. Quinn wrongfully found, based, in part, upon reports written by the FRPD, that there was no evidence that Defendants Campellone and Sullivan had committed a crime when Defendant Campellone shot Anthony.

201.    D.A. Quinn later issued a final report on April 1, 2022, which claimed, wrongfully and falsely, that the shooting was justified in light of Anthony's alleged armed assault on Defendant Sullivan with what the D.A.'s office had allegedly "confirmed" to be a knife.

202.    After her return to work after shooting and killing Anthony, despite initially believing she might be fired, Defendant Campellone was promoted to the position of detective.

203. According to the FRPD's 2023 Annual Report, Defendant Campellone was also given a Medal of Valor, which, according to the FRPD, "is conferred to an employee, in disregard of personal safety, who displayed gallantry, unusual bravery or courage in the protection of life or property, aiding in the apprehension of dangerous criminals or keeping the peace, thereby contributing significantly to law enforcement and crime prevention."

204. Upon information and belief, Defendant Campellone was fraudulently given a Medal of Valor for killing Anthony so as to make it appear that his killing by her was justifiable.

205. On December 5, 2022, Defendant Campellone completed a Use of Force Report pertaining to the shooting of Anthony, but the Report did not discuss the shooting.

206. Defendant Campellone attached a copy of Defendant Sullivan's narrative report from the date of the shooting – a report which described an interview with Grealish before the shooting, but not the shooting itself.

F. ***Monell* Liability**

    a. *The Wrongful Conduct of the FRPD Has a Racial Component.*

        i. *An FRPD Captain is suspended and required to undergo training due to a racially insensitive Facebook post.*

207. On or about January 17, 2021, FRPD Captain Jay Huard ("Captain Huard") was promoted to the rank of Captain by Chief Cardoza and placed in charge of the FRPD's Office of Professional Standards.

208. Captain Huard also served as the FRPD's Public Information Officer and an administrator of the FRPD's Facebook page.

209. On or about April 21, 2021, at approximately 12:10 p.m., Captain Huard shared a Facebook post to the FRPD's official Facebook page.

210. The racist post stated, "Chauvin immediately stood and calmly placed his hands behind his back. Imagine where we'd be had George [Floyd] done the same."

211. The Facebook post was referring to former Minneapolis police officer, Derek Chauvin ("Chauvin"), upon being convicted of murdering George Floyd ("Floyd").

212. Captain Huard later admitted that the post was "insensitive and ignorant."

213. According to Captain Huard, if "the people that are involved in conflicts with the police, if they simply followed directions and then the police take appropriate action that we are trained to do, lives can be saved and harm can be reduced and not have this where the police are being villainized, because it tears at my inner fiber."

214. Captain Huard's statement fails to recognize that a person's failure to follow directions does not automatically permit police officers to use deadly force.

215. Captain Huard received merely symbolic and relatively insignificant punishment from the FRPD, and as such, his remarks appear to have been endorsed by the FRPD.

216. Captain Huard's statement reflects the attitude of the FRPD, in which a police officer is permitted to immediately use deadly force if a person, and, in particular, a person who is not white, fails to comply with their demands.

217. According to the report authored by Liberty Forensics, LLC ("Liberty"), which was the entity hired by FRPD to investigate Captain Huard's post, the "post's positive contrast of [Chauvin's] behavior upon conviction to [Floyd's] behavior was inappropriate. To portray upheaval in society as the responsibility of the victim, as opposed to the convicted murderer invites victim blaming."

218. Liberty recommended that Captain Huard "attend training which focuses on empathy and perspective taking (the act of perceiving a situation or understanding a concept from an alternative point of view, such as that of another individual) [.]"

219. Liberty also recommended that Captain Huard be suspended for thirty (30) days and permanently transferred from the Office of Professional Standards and Public Information Officer of the FRPD.

220. Despite the City and, in particular, the Mayor of Fall River having authority for compliance, upon information and belief, the City and/or Mayor did not exercise any oversight over the incident.

    *ii.*     <u>*Officer Richard Saraiva is recorded saying while apparently mimicking another person, "I'm so sick of these fucking n******! Fuck them n*****, shit . . . acting the fuck up all the time!"*</u>

221. On January 21, 2017, Officer Michael Malek ("Malek") pulled over Courtney Taylor, who is black, for allegedly driving through a red light. Because she had been harassed by the FRPD previously, Ms. Taylor began recording the conversation on her cell phone, when she was pulled over.

222. Malek told Ms. Taylor she was being pulled over because she drove through a "yellow light over there," as if that were illegal. Ms. Taylor denied that the light was "yellow" when she drove through it; rather, she said she sat at it while it was red and started driving when the light turned green.

223. When Ms. Taylor was asked for her driver's license, she presented Malek with her Alabama driver's license, at which time he arrested her for driving with an out-of-state license.

224. Upon being arrested, Ms. Taylor apparently dropped her cell phone in her car, but the responding officers did not realize it was still recording. One of the officers, who identified himself as Officer Richard Saraiva, drove Ms. Taylor's car to a different location.

225. While driving, Officer Saraiva said to an unidentified officer, apparently mimicking what he calls "angry white people," "I'm so sick of these fucking n******! Fuck them n*****, shit . . . acting the fuck up all the time!"

      *iii.*    *Sgt. Steven Washington refers to several African-American juveniles as "n*******" when responding to their call for assistance.*

226. On May 22, 2021, Sgt. Steven Washington ("Washington") and several other officers responded to a call involving juveniles.

227. Subsequently, a complaint was made that during the investigation, Sgt. Washington referred to the juveniles, at least some of whom were, upon information and belief, black, as "n******."

228. Washington did not deny he made the statement; rather, he "stated that if the word was used, it would be a teaching moment."

229. Washington claimed that if he did use the term "n******," it "was one hundred percent professional depending how it was used."

230. According to one of the officers on the scene, he heard Washington say something like, "you guys seem like good kids, you can't be out here acting like n*******."

231. The FRPD determined that the allegation against Sgt. Washington concerning referring to certain juveniles as "little n*******" was true, and, further, the FRPD found that Sgt. Washington violated Section 8.01, Conduct Unbecoming an Officer, and Section 8.02, Conduct Towards the Public.

        b.      *FRPD officers' history of lying for various reasons, such as to cover up their use of excessive force.*

        i.      <u>*Officer Pessoa and three other police officers lie to cover up Pessoa's use of excessive force and civil rights violations.*</u>

232.    In June 2002, Pessoa was hired to be a FRPD police officer.

233.    For approximately 11 years, Pessoa was a FRPD Field Training Officer ("FTO").

234.    As an FTO, Pessoa was responsible for training new recruits in how to perform their job as a FRPD police officer.

235.    As a FTO, Pessoa was responsible for deciding whether the individual recruits would pass and move onto the next stage of police officer training.

236.    On or about February 12, 2019, former FRPD police officers Pessoa, Thomas Roberts ("Roberts") and Sean Aguiar ("Aguiar") (collectively, the "Lafrance Officers") attempted to detain David Lafrance ("Lafrance").

237.    At some point, the Lafrance Officers decided to handcuff Lafrance.

238.    While Lafrance was on his knees and surrounded by the Lafrance Officers, Pessoa punched Lafrance in the face and/or head.

239.    The Lafrance Officers then brought Lafrance to the police cruiser, where Pessoa punched Lafrance again.

240.    FRPD Officers Roberts and Aguiar admitted to falsifying police reports to protect Officer Pessoa.

241.    In June 2023, Pessoa was convicted of falsifying a police report and using excessive force against Lafrance, and he was sentenced to prison.

242.    Pessoa later pleaded guilty to assaulting and violating the civil rights of two other individuals, Carlos Roldan and Aliecer Rodriguez, while Pessoa was a police officer.

*ii.* *__FRPD Officer Nicholas Hoar ("Hoar") is convicted for assaulting a man in custody using excessive force and for failing to report the assault.__*

243.    In December 2020, William Harvey ("Harvey"), who was an arrestee at the Station, suffered a head injury as Officer Hoar was attempting to put him in a holding cell.

244.    On November 29, 2023, Hoar was indicted by the U.S. Department of Justice on two counts: (1) Count I: deprivation of rights under color of law, 18 U.S.C. § 242 and (2) Count II: false reporting, 18 U.S.C. § 1519.

245.    Count I alleged that Hoar, while acting under the color of law as an officer of the FRPD, assaulted an arrestee with a baton and used unreasonable force.

246.    Count II alleged that Hoar "knowingly concealed, covered up, falsified and made a false entry in a record and document with the intent to impede, obstruct the investigation[.]"

247.    In particular, Count II alleges that Hoar "submitted a Supplemental Narrative report that omitted any mention of the fact that HOAR had struck [the arrestee] in the forehead with a baton."

248.    In February, 2024, Hoar was convicted of one count of deprivation of rights under color of law and two counts of false reports.

249.    In April, 2024, Hoar was sentenced to 33 months in prison, followed by a year of supervised release.

*iii.* *__Sgt. Dwaine Cabeceiras admits to lying in his affidavit.__*

250.    On or about January 22, 2019, an individual began firing a weapon near the Fall River Justice Center.  Sgt. Cabeceiras interviewed one Andrew Hickman, who told Sgt. Cabeceiras the shooter wore a "navy blue shirt and a, a twill hat."  In his report, Sgt. Cabeceiras wrote in an

affidavit that Mr. Hickman told him the shooter wore a "dark gray sweatshirt, dark gray sweatpants and a black knit hat." At trial, Sgt. Cabeceiras admitted that his statement was false.

251. Upon information and belief, a code of silence and deception exists between the FRPD's officers to obstruct the legal process.

*iv.* <u>*Other Monell incidents*</u>

252. FRPD and/or its officers have been the subject of many civil rights lawsuits filed in the U.S. District Court for the District of Massachusetts in the past ten years, including, without limitation, the following:

| Court No. | Caption | Filed | Status | Comments |
|---|---|---|---|---|
| 1:14-CV-12989-NMG | Salvidar v. Pridgen, et al | July 14, 2014 | $600,000 default judgment against Officer Pridgen | Officer Pridgen allegedly rapes and beats Salvidar in her home after she requests police assistance. Officer Pridgen not prosecuted and simply allowed to resign. |
| 1:14-CV-14355 | Thompson v. Barboza | December 8, 2014 | Settled for $72,500 | Police officer unlawfully seizes phone of man recording him and arrests him even though First Circuit already held this is lawful activity. Police then deleted cell phone's content. |
| 1:14-CV-13749-NMG | Kotlin v. City of Fall River *et al* | September 30, 2014 | Settled | Filed suit for 1983 violations, and excessive force |
| 1:17-CV-10499-MPK | Roldan v. Pessoa, *et al* | March 24, 2017 | Settled | An officer kicked man and shattered his leg below the knee disabling him |

| | | | | |
|---|---|---|---|---|
| 1:19-cv-10759-NMG | Macomber v. Carreiro, et al. | April 18, 2019 | Settled for $315,000 | Death. Scott Macomber was present when police arrested a female. A witness stated Macomber had his cell phone and was videoing arrest when police attacked him. His autopsy showed blunt trauma to his head, back, legs, back, and contusions. He was tasered 3 times, and died right after being removed from premises. |
| 1:20-cv-11843 | Vieira v. City of Fall River, et al. | October 10, 2020 | Settled for $32,000 | Ms. Vieira was unlawfully arrested for recording a police officer in public. |
| 1:20-cv-11979 | Natal-Lugo, et al. v. City of Fall River, et al. | November 2, 2020 | Pending | Mr. Ruiz-Barreto was shot and killed while sitting in a car with his father |
| Unknown | Harvey v. City of Fall River | Unknown | Settled for $65,000 | Mr. Harvey was injured by Officer Hoar when his head was slammed into a door and hit with a baton. |
| 1:22-cv-10099 | Lafrance v. City of Fall River, et al. | January 25, 2022 | Pending | FRPD used excessive force and lied on police reports to cover-up actions |
| 1:22-cv-12243 | Galego v. the City of Fall River, et al. | December 31, 2022 | Pending | FRPD conducted unlawful search and seizure that resulted in injuries to Mr. Galego due to use of excessive force |

**G.**    **Damages**

253. As a direct and proximate result of Defendants' wrongful conduct, Anthony's beneficiaries, including, without limitation, Anthony's wife, Chelsea, and his daughter, F. J. H., have suffered, and will continue to suffer, physical, mental and emotional distress, including, without limitation, loss of familial relations, Anthony's society, comfort, protection, companionship, love, affection, solace and emotional and moral support.

254. As a direct and proximate result of Defendants' wrongful conduct, F. J. H and Chelsea Harden are entitled to recover wrongful death damages pursuant to Mass. Gen. Laws c. 229 §2.

255. As a direct and proximate result of the Defendants' wrongful conduct, Mack, as Personal Representative of the Estate, and the beneficiaries of the Estate, are entitled to recover statutory damages for Anthony's conscious pain and suffering.

256. As a direct and proximate result of Defendants' wrongful conduct, Antone is entitled to recover damages.

**H.**    **Presentment**

257. On January 19, 2023, Antone and Mack, as Personal Representative of the Estate, through prior counsel, made proper presentment of their claims to the City.

258. On November 14, 2023, Antone and Plaintiff Eric Mack, as Personal Representative of the Estate, made a proper supplemental presentment of claims to the City.

259. More than six months have passed since Plaintiffs presented their claims for damages to the City.

## COUNT I

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden v.
Defendants Campellone and Sullivan**

### Wrongful Death (Mass. Gen. Laws c. 229 §2)

260.    Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

261.    This Count is brought by Plaintiff Mack, as Personal Representative of the Estate against Defendants Campellone and Sullivan for Wrongful Death Based on Intentional or Reckless Conduct in violation of Mass. Gen. Laws c. 229 §2 and outside of the scope of their employment.

262.    Defendant Campellone's shooting of Anthony was intentional or reckless in, among other things, twice pulling the trigger, twice using excessive force and causing physical and fatal harm to Anthony.

263.    Defendant Sullivan's failure to take steps to prevent the shooting of Anthony was intentional or reckless.

264.    As a direct and proximate result of Defendants' wrongful actions, Anthony suffered physical injuries and mental anguish, died, and the Estate and beneficiaries suffered the damages set forth herein.

265.    Through this Count, Plaintiff Mack, as Personal Representative of the Estate, seeks to recover all recoverable damages under Mass. Gen. Laws c. 229 §2, including, without limitation, the loss of the value of Anthony's life, the fair monetary value of Anthony to the persons entitled to receive the damages recovered, non-economic and economic damages, medical bills, loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of Anthony to the persons entitled to the damages recovered, Anthony's reasonable funeral and burial expenses, and a minimum of $5,000 in

punitive damages to the extent Defendants Campellone and Sullivan is/are liable to Plaintiffs for malicious, intentional, willful, wanton or reckless conduct, or for gross negligence.

## COUNT II

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden v. Defendant City of Fall River**

### Wrongful Death (Mass. Gen. Laws c. 229 §2)

266.    Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

267.    This Count is brought by Plaintiff Mack, as Personal Representative of the Estate against Defendant City of Fall River for Wrongful Death Based on Intentional or Reckless Conduct in violation of Mass. Gen. Laws c. 229 §2 and Mass. Gen. Laws c. 258.

268.    Defendant City is a public employer of various individuals, including, without limitation, Defendants Campellone and/or Sullivan, both of whom were "public employees" within the definition of Mass. Gen. Laws c. 258 §1.

269.    Defendant City, as public employer of its public employees, is liable for any injuries caused by the negligent or wrongful acts or omissions of any of its public employees while said employees act within the scope of their employment, pursuant to Mass. Gen. Laws c. 258 §2.

270.    Plaintiff Mack has made appropriate presentment of the Estate's claims pursuant to Mass. Gen. Laws c. 258 to Defendants as set forth above.

271.    Defendant City is liable to Plaintiff Mack for the negligence, and/or gross negligence and/or willful, wanton or reckless conduct of its employees, including, without limitation, Defendants Campellone and Sullivan, in causing the death of Anthony by the inappropriate use of excessive force.

272. Through this Count, Plaintiff Mack, as Personal Representative of the Estate, seeks to recover all recoverable damages under Mass. Gen. Laws c. 229 §2, including, without limitation, the loss of the value of Anthony's life, the fair monetary value of Anthony to the persons entitled to receive the damages recovered, non-economic and economic damages, medical bills, loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of Anthony to the persons entitled to the damages recovered, Anthony's reasonable funeral and burial expenses, and a minimum of $5,000 in punitive damages to the extent that Defendant City is liable to Plaintiffs for malicious, intentional, willful, wanton or reckless conduct, or for gross negligence.

## COUNT III

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden v. Defendants Campellone and Sullivan**

### Conscious Pain and Suffering

273. Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

274. This Count is brought by Plaintiff Mack, as Personal Representative of the Estate against Defendants Chelsea Campellone and Michael Sullivan for conscious pain and suffering in violation of Mass. Gen. Laws c. 229 §2.

275. As a direct and proximate result of the aforesaid wrongful acts of Defendants Campellone and Michael Sullivan outside of the scope of their employment, as set forth above, Anthony has suffered great pain of body and mind, sustained severe personal and financial injuries, personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries have suffered, and will suffer, various losses.

## COUNT IV

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden v. Defendant City of Fall River**

### Conscious Pain and Suffering

276.    Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

277.    This Count is brought by Plaintiff Mack, as Personal Representative of the Estate, against Defendant City for conscious pain and suffering in violation of Mass. Gen. Laws c. 229 §2 and Mass. Gen. Laws c. 258.

278.    As a direct and proximate result of the aforesaid wrongful acts of employees of Defendant City, including, without limitation, Defendants Campellone and Sullivan, within the scope of their employment, as set forth above, Anthony suffered great pain of body and mind, sustained severe personal and financial injuries, personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries have suffered, and will suffer, various losses.

## COUNT V

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden v. Defendant Campellone**

### 42 U.S.C. §1983 (Wrongful Entry/Excessive, Deadly Force)

279.    Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

280.    This Count is brought by Plaintiff Mack, as Personal Representative of the Estate against Defendant Campellone under 42 U.S.C. §1983 for wrongful entry into the Apartment and/or Anthony's bedroom and the use of excessive force, in violation of the Fourth Amendment to the United States Constitution.

281. The actions of Defendant Campellone in, among other things, (a) wrongfully invading the Apartment and/or Anthony's bedroom without any warrant, warning, basis, justification, consent, permission, probable cause, or exigent circumstances therefor, (b) failing to deescalate the encounter with Anthony, (c) failing to employ verbal commands, de-escalation and other lesser means of force, all of which were feasible, against Anthony, and (d) using excessive, unnecessary, unjustified and unreasonable deadly force in attempting the arresting and/or detaining Anthony while killing him were done maliciously, grossly negligently, with deliberate indifference and/or recklessly under color of law and without justification or probable cause.

282. Said conduct thereby obstructed the course of justice and deprived Anthony of numerous federal constitutional rights, including, but not limited to, freedom from unreasonable seizure of their persons, freedom from unreasonable search and seizure under the Fourth Amendment, freedom from excessive force, due process and equal protection under the Fifth and Fourteenth Amendments, and freedom from intimidation and humiliation.

283. At no time did Defendant Campellone have an objectively reasonable belief that deadly force was necessary to protect either herself or Defendant Sullivan from a current, active and immediate threat of death or serious bodily injury.

284. As of the date of the shooting, it was clearly established under existing case law and/or general Fourth Amendment principles and statements of law, and it was apparent or should have been apparent (a) to Defendant Campellone, that Defendant Campellone's unreasonable and unjustified use of deadly force violated Anthony's Fourth Amendment rights, and (b) to Defendants Campellone and Sullivan that they had no lawful basis for entering the Apartment and/or Anthony's bedroom.

285.    The wrongful entry of Defendants Sullivan and Campellone into the Apartment and/or Anthony's bedroom, and intentional or reckless and excessive use of deadly force was such an obvious and/or apparent violation of the Fourth Amendment that prior case law was not required for them to be on notice that their conduct was unlawful and unconstitutional.

286.    A reasonable officer in the position of Defendants Campellone and Sullivan should have known that their conduct constituted violation of the Fourth Amendment.

287.    Said conduct thereby obstructed the course of justice and deprived Anthony of numerous federal constitutional rights as protected by 42 U.S.C. §1983, including, without limitation, his right to seek redress from the courts under the First and Fifth Amendments to the United States Constitution, and the protection against unreasonable search and seizure of his person under the Fourth and Fourteenth Amendments to the United States Constitution.

288.    As a direct and proximate result of the aforesaid wrongful acts of Defendant Campellone, as set forth above, Anthony suffered great pain of body and mind, sustained severe personal and financial injuries, personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries have suffered, and will suffer, various losses.

### COUNT VI

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden v.
Defendant Sullivan**

### 42 U.S.C. §1983 (Wrongful Entry/Failure to Intervene/Excessive Force)

289.    Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

290.    This Count is brought by Plaintiff Mack, as Personal Representative of the Estate against Defendant Sullivan under 42 U.S.C. §1983 for his wrongful entry into the Apartment and/or Anthony's bedroom, his failure to intervene to protect Anthony from Defendant

Campellone's unreasonable use of deadly force, and his use of excessive force, in violation of the Fourth Amendment to the United States Constitution.

291.    The actions of Defendant Sullivan in, among other things, (a) wrongfully invading the Apartment and/or Anthony's bedroom without any warrant, warning, basis, justification, consent, permission, probable cause, or exigent circumstances therefor, (b) failing to take steps to prevent or stop Defendant Campellone's use of excessive and deadly force, and (c) using excessive force, was done maliciously, grossly negligently, with deliberate indifference and/or recklessly under color of law and without justification or probable cause.

292.    Said conduct thereby obstructed the course of justice and deprived Anthony of numerous federal constitutional rights, including, but not limited to, freedom from unreasonable seizure of their persons, freedom from unreasonable search and seizure under the Fourth Amendment, freedom from excessive force, due process and equal protection under the Fifth and Fourteenth Amendments, and freedom from intimidation and humiliation.

293.    As of the date of the shooting, it was clearly established under existing case law and/or general Fourth Amendment principles and statements of law, and it was apparent to Defendant Sullivan, that Defendant Campellone's unreasonable and unjustified use of deadly force violated Anthony's Fourth Amendment rights and that Defendant Sullivan needed to intervene.

294.    The need for Defendant Sullivan to intervene in order to prevent Defendant Campellone's intentional or reckless and excessive use of deadly force was such an obvious and/or apparent violation of the Fourth Amendment that prior case law was not required for Defendant Sullivan to be on notice that his failure to act was unlawful and unconstitutional.

295.    A reasonable officer in the position of Defendant Sullivan should have known that intervention was required.

296.     Said conduct thereby obstructed the course of justice and deprived Anthony of numerous federal constitutional rights as protected by 42 U.S.C. §1983, including, without limitation, his right to seek redress from the courts under the First and Fifth Amendments to the United States Constitution, and the protection against unreasonable search and seizure of his person under the Fourth and Fourteenth Amendments to the United States Constitution.

297.     As a direct and proximate result of the aforesaid wrongful acts of Defendant Sullivan, as set forth above, Anthony suffered great pain of body and mind, sustained severe personal and financial injuries, personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries have suffered, and will suffer, various losses.

## COUNT VII

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden v. Defendants Campellone and Sullivan**

**Civil Rights Violations Pursuant to Mass. Gen. Laws c. 12 §§11H and 11I**

298.     Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

299.     This count is brought by Plaintiff Mack, as Personal Representative of the Estate against Defendants Campellone and Sullivan for civil rights violations pursuant to M.G.L. c.12 §§11H and 11I.

300.     In the actions and omissions set forth above, Defendants Campellone and Sullivan, while acting under color of law, interfered by threats, intimidation or coercion, or attempted to interfere by threats, intimidation or coercion, with the exercise or enjoyment by Anthony of rights secured by the constitution or laws of the United States and/or the Commonwealth of Massachusetts, including, without limitation, Anthony's right to be free from excessive force and unreasonable search and seizure, in violation under the First, Fourth, Fifth and Fourteenth

Amendments to the United States Constitution and Articles 12 and 14 of the Massachusetts Declaration of Rights, all in violation of M.G.L. c. 12 §§11H and 11I.

301.     As a direct and proximate result of the aforesaid wrongful acts of Defendants Campellone and Sullivan, as set forth above, Anthony suffered great pain of body and mind, sustained severe personal and financial injuries, personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries have suffered, and will suffer, various losses.

**COUNT VIII**

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden v. Defendants Campellone and Sullivan**

**Assault and Battery**

302.     Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

303.     This count is brought by Plaintiff Mack, as Personal Representative of the Estate, against Defendants Campellone and Sullivan for assault and battery.

304.     As described herein, the actions of Defendants Campellone and Sullivan against Anthony constitute the intentional tort of assault and battery.

305.     As a direct and proximate result of the aforesaid wrongful acts of Defendants Campellone and Sullivan, as set forth above, Anthony suffered great pain of body and mind, sustained severe personal and financial injuries, personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries have suffered, and will suffer, various losses.

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden v. Defendants Campellone and Sullivan**

**Intentional Infliction of Emotional Distress**

306.     Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

307.     This count is brought by Plaintiff Mack, as Personal Representative of the Estate against Defendants Campellone and Sullivan for intentional infliction of emotional distress.

308.     The knowing, intentional and willful conduct of Defendants Campellone and Sullivan, as set forth above, was extreme and outrageous, beyond all possible bounds of decency, utterly intolerable in a civilized community and no reasonable person should be expected to bear it.

309.     As a direct and proximate result of the aforesaid wrongful acts of Defendants Campellone and Sullivan, as set forth above, Anthony suffered great pain of body and mind, has sustained severe personal and financial injuries, personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries have suffered, and will suffer, various losses.

**COUNT X**

**Plaintiff Antone Harden v. Defendants Pavao and Faris**

**42 U.S.C. §1983 (Wrongful Entry, Excessive Force)**

310.     Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

311.     This count is brought by Plaintiff Antone Harden against Defendants Pavao and Faris for wrongful entry and excessive force in violation of the Fourth Amendment to the United States Constitution.

312.     The actions of Defendants Pavao and Faris, in using excessive force by, among other things, (a) invading Antone's bedroom without consent, probable cause or other justifiable reason, (b) removing Antone from his bedroom at gunpoint, (c) arresting Antone even though he had engaged in no wrongdoing whatsoever and posed no threat to police, and (d) placing Antone in handcuffs (which remained on him while he was transported in a cruiser to the FRPD station, and from then until after an interview was completed at the police station), were done maliciously, grossly negligently, with deliberate indifference and/or recklessly under color of law and without justification or probable cause.

313.     Said conduct thereby obstructed the course of justice and deprived Antone of numerous federal constitutional rights, including, but not limited to, freedom from unreasonable seizure of their persons, freedom from unreasonable search and seizure under the Fourth Amendment, freedom from excessive force, due process and equal protection under the Fifth and Fourteenth Amendments, and freedom from intimidation and humiliation.

314.     As a direct and proximate result of the aforesaid acts of the Defendants, who were acting under color of law, Antone has suffered from, and will continue to suffer from, physical injuries, mental anguish and other damages.

## COUNT XI

**Plaintiff Antone Harden v. Defendants Pavao and Faris**

**42 U.S.C. §1983 (Conspiracy to Violate Antone's Rights)**

315.     Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

316.     This Count is brought by Plaintiff Antone Harden against Defendants Pavao and Faris under 42 U.S.C. §1983 for conspiracy to violate Antone's civil rights.

317.    As set forth herein, Defendants Pavao and Faris, while acting under color of law, and others, acted in concert and conspired to violate Antone's right to be free from unreasonable searches and seizures by, among other things, (a) invading Antone's bedroom without consent, probable cause or other justifiable reason, (b) removing Antone from his bedroom at gunpoint, (c) arresting Antone even though he had engaged in no wrongdoing whatsoever and posed no threat to police, (d) placing Antone in handcuffs (which remained on him while he was transported in a cruiser to the FRPD station, and from then until after an interview was completed at the police station) and (e) interviewing him and pressuring him during the post-shooting interview to say untruths about his brother and about the circumstances of his brother's shooting at the Apartment so as to justify the shooting of Anthony and to protect Defendants Campellone and Sullivan from penalty for their misdeeds.

318.    Said conduct thereby obstructed the course of justice and deprived Antone of numerous federal constitutional rights, including, but not limited to, freedom from unreasonable seizure of their persons, freedom from unreasonable search and seizure under the Fourth Amendment, freedom from excessive force, due process and equal protection under the Fifth and Fourteenth Amendments, and freedom from intimidation and humiliation.

319.    As a direct and proximate result of the aforesaid wrongful acts of Defendants Pavao and Faris, as set forth above, Antone has suffered from, and will continue to suffer from, physical injuries, mental anguish and other damages.

## COUNT XII

### Plaintiff Antone Harden v. Defendants Pavao and Faris

### 42 U.S.C. §1985 (Conspiracy to Violate Antone's Rights)

320.     Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

321.     This Count is brought by Plaintiff Antone Harden against Defendants Pavao and Faris under 42 U.S.C. §1985 for conspiracy to violate Antone's civil rights based upon discriminatory animus because Antone is black.

322.     As set forth herein, Defendants Pavao and Faris, while acting under color of law, and others, acted in concert based upon discriminatory racial animus and conspired to violate Antone's right to be free from unreasonable searches and seizures by, among other things, (a) invading Antone's bedroom without consent, probable cause or other justifiable reason, (b) removing Antone from his bedroom at gunpoint, (c) arresting Antone even though he had engaged in no wrongdoing whatsoever and posed no threat to police, (d) placing Antone in handcuffs (which remained on him while he was transported in a cruiser to the FRPD station, and from then until after an interview was completed at the police station) and (e) interviewing him and pressuring him during the post-shooting interview to say untruths both about his brother and about the circumstances of his brother's shooting at the Apartment so as to justify the shooting of Anthony and protect Defendants Campellone and Sullivan from penalty for their misdeeds.

323.     Said conduct thereby obstructed the course of justice and deprived Antone of numerous federal constitutional rights, including, but not limited to, freedom from unreasonable seizure of their persons, freedom from unreasonable search and seizure under the Fourth

Amendment, freedom from excessive force, due process and equal protection under the Fifth and Fourteenth Amendments, and freedom from intimidation and humiliation.

324.    As a direct and proximate result of the aforesaid wrongful acts of Defendants Pavao and Faris, as set forth above, Antone has suffered from, and will continue to suffer from, physical injuries, mental anguish and other damages.

## COUNT XIII

**Plaintiff Antone Harden v. Defendants Pavao and Faris**

**Civil Rights Violations Pursuant to Mass. Gen. Laws c. 12 §§11H and 11I**

325.    Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

326.    This count is brought by Plaintiff Antone Harden against Defendants Pavao and Faris for civil rights violations pursuant to M.G.L. c.12 §§11H and 11I.

327.    In the actions and omissions set forth above, Defendants Pavao and Faris, while acting under color of law, interfered by threats, intimidation or coercion, or attempted to interfere by threats, intimidation or coercion, with the exercise or enjoyment by Antone of rights secured by the constitution or laws of the United States and/or the Commonwealth of Massachusetts, including, without limitation, Antone's right to be free from excessive force and unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights, and right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights, in violation of M.G.L. c.12 §§11H and 11I.

328.     As a direct and proximate result of the aforesaid wrongful acts of Defendants Pavao and Faris, as set forth above, Antone has suffered from, and will continue to suffer from, physical injuries, mental anguish and other damages.

## COUNT XIV

### Plaintiff Antone Harden v. Defendants Pavao and Faris

### Intentional Infliction of Emotional Distress

329.     Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

330.     This count is brought by Plaintiff Antone Harden against Defendants Pavao and Faris for intentional infliction of emotional distress.

331.     The knowing, intentional and willful conduct of Defendants Pavao and Faris, as set forth above, was extreme and outrageous, beyond all possible bounds of decency, utterly intolerable in a civilized community and no reasonable person should be expected to bear it.

332.     As a direct and proximate result of the aforesaid wrongful acts of Defendants Pavao and Faris, as set forth above, Antone has suffered from, and will continue to suffer from, physical injuries, mental anguish and other damages.

## COUNT XV

### Plaintiff Eric Mack, as Personal Representative of the Estate of Anthony Harden and Antone Harden v. Defendants City of Fall River, Parousis and Cardoza

### *Failure to Train/Supervise* Claim Pursuant to 42 U.S.C. §1983

333.     Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

334. This Count is brought by Plaintiffs Eric Mack, as Personal Representative of the Estate, and Antone Harden against Defendant City, Parousis and Jeffrey Cardoza for failure to train and failure to supervise.

335. At all times relevant hereto, Defendants Campellone, Sullivan, Parousis, Pavao, Faris, and Cardoza, while agents, servants and/or employees of the City, were acting under color of law and within the scope of their authority as police officers pursuant to the City's established policies, rules, regulations, ordinances, customs and usages.

336. Defendant City and its officers, agents, servants or employees, including without limitation, Defendants Parousis and Cardoza, acting individually, failed to train and/or supervise its/their officers, agents, servants or employes, including, without limitation, Defendants Campellone, Sullivan, Parousis, Pavao, and Faris, suitably regarding, among other things: (a) when an officer must be put on medical leave because of personal issues, including, but not limited to, under the Early Warning System Policy, (b) when an officer must avoid responding to certain types of calls from members of the public because of the officer's own personal issues, (c) de-escalation and the use of force, including, without limitation, deadly force, (d) the preparation of police reports after an incident, (e) the preservation of evidence, (f) the constitutional limits on the use of deadly force, (g) documenting basic investigative activities accurately, (h) issues relating to harassment and racial discrimination, (i) detaining individuals who have engaged in no wrongdoing whatsoever, (j) failing to investigate properly complaints of misconduct against FRPD officers, (k) failing to discipline and/or prosecute officers that have committed an act of misconduct, and (l) ensuring that individuals have their right of access to courts.

337. Defendant City's training and supervision was not adequate to train and supervise FRPD officers, including, without limitation, Defendants Campellone, Sullivan, Parousis, Pavao,

and Faris, concerning the above issues, which led to and proximately caused the unlawful shooting of Anthony and the unlawful detention of Antone and the attempts by the officers to conceal the true facts of the police officers' unlawful behaviors.

338.     Defendants Parousis and Cardoza knew that more and/or different training and supervision was needed to correct the issues set forth above, or that, as to Defendants Campellone, Sullivan, Pavao, and Faris, the need for more training and supervision should have been obvious and Defendants Parousis and Cardoza knew same.

339.     These failures on the part of Defendants City, Parousis and Cardoza are signs of recklessness and gross negligence and exhibit a deliberate indifference by Defendants City, Parousis and Cardoza which is a shock to the conscience of all people.

340.     As a direct and proximate result of the aforesaid wrongful acts of Defendants City, Parousis and Cardoza, as set forth above, Anthony and Antone suffered, and Antone will continue to suffer, great pain of body and mind, have sustained severe personal and financial injuries, and Anthony personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries suffered various losses.

## COUNT XVI

**Plaintiff Eric Mack, as Personal Representative of the Estate of Anthony Harden and Antone Harden v. Defendant City of Fall River**

### *Monell* Claim Pursuant to 42 U.S.C. §1983

341.     Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

342.     This Count is brought by Plaintiff Eric Mack, as Personal Representative of the Estate, and Antone Harden against Defendant City for its above-described intentional, reckless,

grossly negligent, callously indifferent and/or other wrongful conduct pursuant to 42 U.S.C. §1983. *See Monell v. City of New York Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

343. Defendant City participated in a pattern of conduct, and has demonstrated a custom and policy of deliberate indifference to the rights of citizens, consisting of, among other things, (a) tolerating, creating and/or maintaining a custom and policy where black individuals are not afforded the same rights, privileges, immunities and courtesies as white individuals, (b) tolerating, creating and/or maintaining a custom and policy of using excessive force against persons of color, (c) detaining individuals who have engaged in no wrongdoing whatsoever, (d) depriving individuals of their right of access to courts, (e) failing to take proper remedial action against FRPD officers who committed illegal acts, including, without limitation, excessive force, unreasonable detentions, false arrests, and fabricated police reports, and (f) tolerating, creating and/or maintaining a custom and policy of, in concert with others, covering up wrongdoing of its own police officers, through, among other things, the creation and filing of false reports.

344. In failing to discipline FRPD officers who have committed wrongful acts, Defendant City has supported and promulgated a policy, a pattern, a practice and/or a procedure of tolerating, ratifying, promoting and/or encouraging such acts.

345. The foregoing customs, policies, patterns and/or practices are the product of a culture of tolerance by the City of the FRPD in which verbal abuse, physical assaults, unreasonable detentions, false arrests, fabrication of police reports and/or the violation of citizen's civil rights are ignored, encouraged and/or accepted as proper conduct by FRPD, especially against black persons.

346.	These failures on the part of Defendant City are signs of recklessness and gross negligence and exhibit a deliberate indifference by Defendant City which is a shock to the conscience of all people.

347.	As a direct and proximate result of the aforesaid wrongful acts of Defendant City, as set forth above, Anthony and Antone suffered, and Antone will continue to suffer, great pain of body and mind, have sustained severe personal and financial injuries, and Anthony personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries suffered various losses.

## COUNT XVII (IN THE ALTERNATIVE)

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden and Plaintiff Antone Harden v. Defendants Campellone, Sullivan, Parousis, and Pavao**

**42 U.S.C. §1983 (Conspiracy to Violate Rights of the Estate and Antone to Access to Court)**

348.	Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

349.	This Count is brought by Plaintiff Mack, as Personal Representative of the Estate, and Plaintiff Antone Harden against Defendants Campellone, Sullivan, Parousis and Pavao under 42 U.S.C. §1983 for conspiracy to violate the rights of the Estate and Antone to access to the courts.

350.	As set forth herein, Defendants Campellone, Sullivan, Parousis, and Pavao, while acting under color of law, and others, including, without limitation, D.A. Quinn, the Bristol County District Attorney's Office, and the MSP Detective Unit, acted in concert and conspired to violate the rights to due process of the Estate and Antone by fabricating evidence and withholding, concealing, suppressing and/or destroying material evidence in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

351.    The above named Defendants had knowledge of the wrongs done by Defendants Campellone and Sullivan, took steps to conceal the excessive use of force, to fabricate that Anthony possessed, held and/or used a knife during his encounter with Defendants Campellone and Sullivan, and to hide the facts surrounding the true circumstances surrounding the death of Anthony, through, among other things, verbal and written statements and reports, in such a manner as to frustrate Plaintiffs in this litigation and deprive Plaintiffs of their right to access to the courts and right to seek redress from the courts for their claims against Defendants as set forth herein, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

352.    The wrongful conduct of Defendants have rendered and/or have attempted to render any available court remedy ineffective for Plaintiffs.

353.    As a direct and proximate result of the aforesaid wrongful acts of Defendants Sullivan, Campellone, Parousis and Pavao, and others, as set forth above, Anthony and Antone suffered, and Antone will continue to suffer, great pain of body and mind, both sustained severe personal and financial injuries, Anthony personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries suffered various losses.

## COUNT XVIII (IN THE ALTERNATIVE)

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden and Plaintiff Antone Harden v. Defendants Campellone, Sullivan, Parousis, and Pavao**

## 42 U.S.C. §1985 (Conspiracy to Violate the Rights of the Estate and Antone to Access to Court)

354.    Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

355.    This Count is brought by Plaintiff Mack, as Personal Representative of the Estate, and Plaintiff Antone Harden against Defendants Campellone, Sullivan, Parousis and Pavao under

42 U.S.C. §1985 for conspiracy to violate the rights of the Estate and Antone to access to the courts based upon discriminatory animus against black men Anthony and Antone..

356.    As set forth herein, Defendants Campellone, Sullivan, Parousis, and Pavao, while acting under color of law, and others, including, without limitation, D.A. Quinn, the Bristol County District Attorney's Office, and the MSP Detective Unit, acted in concert and conspired based upon discriminatory racial animus to violate the rights of the Estate and Antone to due process by, among other things, fabricating evidence and withholding, concealing, suppressing and/or destroying material evidence in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

357.    The above named Defendants had knowledge of their wrongs done by themselves and each other, took steps to conceal the excessive use of force, to fabricate that Anthony possessed, held and used a knife during his encounter with Defendants Campellone and Sullivan, and to hide the facts surrounding the true circumstances surrounding the death of Anthony, through, among other things, verbal and written statements and reports, in such a manner as to deprive Plaintiffs of their right to access to the courts and right to seek redress from the courts for their claims against Defendants as set forth herein, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

358.    The above named Defendants had knowledge of the wrongs done by Defendants Campellone and Sullivan, took steps to conceal the excessive use of force, to fabricate that Anthony held and used a knife during his encounter with Defendants Campellone and Sullivan, and to hide the facts surrounding the true circumstances surrounding the death of Anthony, through, among other things, verbal and written statements and reports, in such a manner as to deprive Plaintiffs of their right to access to the courts and right to seek redress from the courts for

their claims against Defendants as set forth herein, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

359.    The wrongful conduct of Defendants have rendered and/or have attempted to render any available court remedy ineffective for Plaintiffs.

360.    As a direct and proximate result of the aforesaid wrongful acts of Defendants Campellone, Sullivan, Parousis and Pavao, and others, as set forth above, Anthony and Antone suffered, and Antone will continue to suffer, great pain of body and mind, both sustained severe personal and financial injuries, Anthony personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries suffered various losses.

## COUNT XIX (IN THE ALTERNATIVE)

**Plaintiff Mack, as Personal Representative of the Estate of Anthony Harden, and Plaintiff Antone Harden v. Defendants Campellone, Sullivan, Parousis, and Pavao**

## Mass. Gen. Laws c. 12 §§11H and 11I (Conspiracy to Violate Rights of the Estate, Anthony and Antone to Access to Court)

361.    Plaintiffs repeat and reallege all of the allegations contained in the Complaint as if expressly set forth herein.

362.    This Count is brought by Plaintiff Mack, as Personal Representative of the Estate against Defendants Campellone, Sullivan, Parousis and Pavao under Mass. Gen. Laws c. 12 §§11H and 11I for conspiracy to violate the rights of the Estate and Antone to access to the courts.

363.    As set forth herein, Defendants Campellone, Sullivan, Parousis, and Pavao, while acting under color of law, and others, including, without limitation, D.A. Quinn, the Bristol County District Attorney's Office, and the MSP Detective Unit, acted in concert and conspired to interfere by threats, intimidation and coercion, with the exercise or enjoyment by the Estate and Antone of their due process right to access to the Court in violation of the Fourth, Fifth and Fourteenth

Amendments to the United States Constitution and Articles 12 and 14 of the Massachusetts Declaration of Rights, all in violation of M.G.L. c. 12 §§11H and 11I.

364. The above named Defendants had knowledge of the wrongs done by Defendants Campellone and Sullivan, took steps to conceal the excessive use of force, to fabricate that Anthony possessed, held and/or used a knife during his encounter with Defendants Campellone and Sullivan, and to hide the facts surrounding the true circumstances surrounding the death of Anthony, through, among other things, verbal and written statements and reports, in such a manner as to frustrate Plaintiffs in this litigation and deprive Plaintiffs of their right to access to the courts and right to seek redress from the courts for their claims against Defendants as set forth herein, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution and Articles 12 and 14 of the Massachusetts Declaration of Rights, all in violation of M.G.L. c. 12 §§11H and 11I.

365. The wrongful conduct of Defendants have rendered and/or have attempted to render any available court remedy ineffective for Plaintiffs.

366. As a direct and proximate result of the aforesaid wrongful acts of Defendants Campellone, Sullivan, Parousis and Pavao, and others, as set forth above, Anthony and Antone suffered, and Antone will continue to suffer, great pain of body and mind, both sustained severe personal and financial injuries, Anthony personally lost the ability to live, enjoy and carry on with his life, and the Estate and beneficiaries suffered various losses.

**WHEREFORE**, Plaintiffs request that this Court:

a. Award judgment in favor of Plaintiffs and against all Defendants;

b. Award compensatory damages in favor of Plaintiffs and against all Defendants;

c. Award punitive damages in favor of Plaintiffs and against all Defendants, to the

extent permissible;

d.      Award the costs of this action, including, without limitation, reasonable attorneys' fees and interest in favor of Plaintiffs and against all Defendants, to the extent permissible;

e.      Declare that Defendant City had engaged in a pattern or practice of conduct that deprives persons of rights, privileges, or immunities secured and/or protected by the Constitution or laws of the United States in violation of 42 U.S.C. §1983;

f.      Enter a preliminary and permanent injunction ordering Defendant City, its officers, agents, and employees from engaging in any of the predicate acts forming the basis of the pattern or practice of conduct described herein;

g.      Enjoin any further acts by any of the Defendants seeking to impede Plaintiffs from seeking access to or redress from the Courts; and

h.      Award such further relief as this Court may deem necessary and appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY
ON ALL ISSUES SO TRIABLE**

The Plaintiffs,
ERIC B. MACK, as Personal Representative of the
Estate of ANTHONY HARDEN, and
ANTONE HARDEN
By Their Attorneys,

*/s/ Paul J. Klehm*
Paul J. Klehm BBO #561605
pklehm@kkf-attorneys.com
James B. Krasnoo BBO# 279300
jkrasnoo@kkf-attorneys.com
Benjamin J. Falkner BBO# 667951
bfalkner@kkf-attorneys.com
Krasnoo, Klehm & Falkner LLP
28 Andover Street, Suite 240
Andover, MA 01810
Dated: November 8, 2024      (978) 475-9955